## J. O. JACKSON V. THE STATE.

No. 21274. Delivered November 27, 1940.

Rehearing Denied February 26, 1941.

The opinion states the case.

*Oscar B. Jones, J. H. Broadhurst, Charles Yonge,* and *Cecil Storey,* all of Longview, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is murder; the punishment, confinement in the penitentiary for five years.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed Jonas Nabors by shooting him with a gun.

Appellant, who is a white man, was engaged in the taxi-cab business in the City of Longview. Deceased, who was a negro, ran a shoe-shining establishment, and also operated his automobile in hauling negro passengers for pay. On the 25th of February, 1940, after arming himself with a shotgun, appellant drove with a companion in one of his taxi-cabs to Bob Lloyd's in search of deceased. On arriving at Lloyd's appellant, according to his testimony, observed deceased's car parked there. Stopping his own car, he waited for deceased to appear. In about fifteen minutes deceased came out of the house and appellant called him, saying, "Come over here Jonas." Instead of complying with the request of appellant, deceased ran toward his (deceased's) car; whereupon appellant shot and killed him. According to the testimony of the State, appellant shot deceased three or four times; and, further, according to the State's version, deceased was making no demonstration toward the appellant at the time he was killed. It was the State's version, given support in the testimony, that appellant killed deceased because of the fact that deceased was his competitor in business

and was securing patronage which appellant thought belonged to him.

Appellant testified that shortly before he killed deceased he had been informed that deceased was threatening to kill him. He armed himself and sought deceased for the purpose of talking to him about the matter. He testified that he had no intention of killing deceased but only wanted to talk to him relative to the threats deceased had made to take his life. It was his further version that when he called deceased, deceased ran toward his car, leading him to believe that he was after a gun. At this juncture we quote from the testimony of the appellant, as follows:

"I knew in my own mind he had a gun in the car and when he made a break to his car, I shot him. As to whether I was in fear of my life at the time I shot him or not, I knew he would kill me if I didn't kill him, if he got to that car. I was pretty well excited. They say I shot five times, I don't remember."

Appellant also testified to the effect that he had heard that deceased was a violent and dangerous man.

The State's theory relative to appellant's motive in taking the life of deceased is shown in the cross-examination of the appellant. We quote from the testimony given by appellant on such cross-examination as follows:

"You have asked me the question if for some time past Jonas (deceased) and I hadn't had difficulties about Jonas picking up my calls down in Old Field and I will answer no, not Jonas particularly. As to whether I had been going to the City Police Department and asking them to arrest Jonas along with others, will say I asked them to stop these negroes wildcating. In answer to your question if they were negroes that would haul them for less money than I would haul them for, will say I don't know what they were hauling them for. It was my understanding they were hauling people I should have been hauling. In answer to your question that that was the reason I appealed to the City Officers and on June 22, 1939, I recall marking some money and giving it to a negro to hand Jonas Nabors, will say I don't know whether I put the marks on the money or not. Mr. Calloway and I marked it and I think he put the marks on it. This is the same Mr. Calloway who testified in this case today. He placed the marks on the money and got the negro to go hire Jonas to take him some place. After the negro got in the car Mr. Calloway and Mr. Woodall arrested Jonas and

found him with the marked money we had given him to hire him, and after that Jonas plead guilty to operating a cab without a city license and paid his fine. From that time on when I spoke to Jonas he would frown at me. I didn't kill Jonas because he frowned at me. All during the past year from July on down to February 25, Jonas and I had no difficulty. As to how many waterhauls my taxis made to Nelson Street on February 25th, will say we make waterhauls everywhere; in fact, about ten percent of our business is waterhauls. I don't know how many we made to Old Field that day. We had made some."

It is shown in bill of exception No. 3 that C. E. Barker, a witness for appellant, operated one of appellant's taxi-cabs. This witness testified that he knew of no difficulties appellant had had with the deceased prior to the homicide; and, further, that he did not know appellant had filed charges against deceased in connection with the operation by deceased of his taxi-cab. It is further reflected by the bill that State's counsel asked the witness upon cross-examination if he had not heard appellant refer to the fact that deceased had been "picking up fares" which appellant should have gotten. Upon appellant's objection to the question being overruled, the witness answered; "The drivers were talking among themselves about Jonas getting calls they was supposed to get. But they never went to Mr. Jackson about stuff like that for it was for them to figure out." Appellant contented himself with objecting to the answer of the witness on the ground that such answer was "irrelevant, immaterial, hearsay, prejudicial and had no bearing upon the case." No request was made to withdraw the testimony. However, in view of the fact that the court overruled the objection as stated to the bill of exception, and of the further fact that we deem the error, if any, which was committed in receiving the testimony, to be harmless, we leave undecided the question whether the bill of exception is sufficient. Our conclusion that the error, if any, was harmless follows from the fact that appellant, without objection, gave substantially the same testimony as that of the witness. We refer to the last quotation from appellant's testimony hereinbefore set out. It is observed from such testimony that appellant had asked the officers to prevent deceased and other negroes from "wildcating." Further, it is observed from appellant's quoted testimony that he understood that deceased and other negroes had been hauling people that he (appellant) should have been hauling. Again, it is observed from appellant's testimony that he had gotten the officers to have marked money used by a negro passenger in

paying deceased for services rendered in hauling him. Appellant testified that when deceased was arrested with the marked money in his possession he (deceased) plead guilty to operating a cab without a city license, and paid his fine. In view of appellant's testimony touching deceased's alleged activities in operating a taxi-cab, which apparently were deemed by appellant to unfairly interfere with his own business, the reception of the testimony of the witness Barker, to which reference has been made, should not work a reversal of the judgment.

Appellant testified, in effect, that he had heard deceased had been in trouble in the State of Louisiana. On this point we quote appellant's testimony: "I had heard about the trouble that he (deceased) had in Louisiana before he came down here, that some white folks had run him out of town. I hadn't heard much about that." In this connection it is shown in bill of exception No. 1 that Alex Lewis, a witness for appellant, had testified that deceased's general reputation as a peaceable and law-abiding citizen in the community in which he lived was bad. Further, he testified that deceased was a man "who would be reasonably calculated to carry out a threat he would make to kill a man." After the witness had given such testimony appellant offered to prove by him that deceased had been in trouble in the State of Louisiana, and that his trouble was of such a nature that he had to leave that state and come to Texas. The State's objection to the proffered testimony was sustained. It is appellant's contention that the bill of exception reflects error. He cites the cases of this court which correctly announce the general rule as follows: "If self-defense is an issue, defendant may prove anything known to him prior to the homicide about deceased as going to show why defendant acted. Proof of specific acts of unlawful violence committed by deceased on others is admissible, if defendant knew of them prior to the homicide, to show who was probably the aggressor, and to show the state of mind of defendant, and to shed light upon the standpoint of defendant at the time of the homicide." See Section 2094, Branch's Ann. P. C., and Beckham v. State, 109 S. W. (2d) 764. It is observed that the character of trouble deceased was alleged to have been in in Louisiana is not shown, either in the testimony of the appellant or the bill of exception relating to the proffered testimony of the witness Lewis. As far as the record discloses the matter, deceased might have been guilty of conduct in Louisiana which was reprehensible and yet been guilty of no specific acts tending to show that he was a violent or dangerous man. For example, the deceased might have been

guilty of theft of chickens or gambling and yet not have committed any act of violence indicating that he was a dangerous man. Acts constituting the offenses last mentioned, within themselves, could not be said to show that deceased was probably the aggressor at the time he was killed, or to shed light upon the standpoint of the appellant at the time of the homicide. The cases we have examined in which the rule has been given application have been concerned with proof of specific acts of violence on the part of the deceased. We know of no case holding that proof in general terms that the deceased had been in trouble is admissible under the rule announced in Section 2094, Branch, supra, and in Beckham, supra, and the authorities there collated. We do not feel warranted in holding that proof of specific acts of misconduct on the part of the deceased, not shown to have a tendency to characterize him as a violent or dangerous man, is, under the circumstances reflected by this record, admissible.

Appellant contends that the court should have instructed the jury, in substance, that he had the right to arm himself and seek an explanation from deceased relative to the deceased's threats to kill him. The charge of the court gave appellant the unlimited right of self-defense. Ordinarily, when such right is given, a charge of the nature appellant now contends he should have had is not required. Be that as it may—and we leave undecided the question as to whether the charge would have been proper—it is observed that appellant failed to except to the charge of the court for its failure to give the instruction on the subject; nor did he present a requested charge covering such subject. Under the circumstances, we are not warranted in reviewing the question.

After carefully examining the record in the light of appellant's brief, we are of opinion that reversible error is not presented.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Appellant still insists that the trial court was in error in

declining to permit the witness Lewis to testify that deceased had been in trouble in Louisiana of such character that he had to leave that state ·and come to Texas. Complaint of this matter was brought forward in Bill of Exception No. 1, which was treated at some length in our original opinion, to whicl reference is here made to avoid repetition. In support of his motion on this point appellant cites us to Smith v. State, 67 Texas Cr. R. 27, 148 S. W. 699; Childers v. State, 30 Texas Cr. App. 160, 16 S. W. 904; and Russell v. State, 11 Texas Cr. App. 288. In both the Smith and Childers cases the incidents sought to be shown regarding the deceased and which the accused knew about, or of which he had been informed, would have characterized deceased as a violent and dangerous man. Therein lies the distinction between those cases and the incident here under consideration. In Russell's case, we understand the point discussed in the opinion related to proof of acts of violence and assault by deceased which had been made upon the defendant, which had occurred at times prior to the killing. The exact question now before us was decided in Pollard v. State, 58 Texas Cr. R. 299, 125 S. W. 390, and Roquemore v. State, 59 Texas Cr. R. 568, 129 S. W. 1120, and sustains the holding announced in our original opinion.

Appellant also again urges that Bill of Exception No. 3 presents error calling for a reversal. Upon further consideration we remain of the opinion already expressed that the error, if any, was harmless in view of appellant's own evidence, which is sufficiently set out in our former opinion.

The motion for rehearing is overruled.